IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FRANKLIN DAVIS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | No. 3:21-CV-2333-B-BN |
| ERIC GUERRERO, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

The matters before the court are (1) Davis's original petition for federal habeas relief, filed November 5, 2021 (ECF no. 33); (2) Davis's proposed amended petition, filed July 5, 2024 (ECF no. 108-1); (3) the Magistrate Judge's findings, conclusions, and recommendation that federal habeas relief be denied, filed June 17, 2025 ("FCR") (ECF no. 123); (4) Respondent's objections to the Magistrate Judge's FCR, filed July 1, 2025 (ECF no. 126); (5) Davis's motion for leave to file excessive objections, filed September 2, 2025 (ECF no. 132); and (6) Davis's 85 pages of objections to the Magistrate Judge's FCR, also filed September 2, 2025 (ECF no. 133).

Petitioner Franklin Davis filed this federal habeas corpus action pursuant to 28 U.S.C. Section 2254 challenging his state court conviction for capital murder. For the reasons discussed below, Davis is entitled to neither federal habeas relief nor a Certificate of Appealability ("CoA") from this court.

## I. INTRODUCTION

Davis testified during the guilt-innocence phase of his capital murder trial in November 2013 and admitted that he intentionally murdered his teenage victim after weeks in which he stalked her, both physically and electronically, cloned her cell phone, and used a sophisticated computer

application to send his own cell phone text messages purporting to be from his victim's phone. Davis insisted that he was justified in doing so because his victim had made false accusations that Davis had sexually assaulted her multiple times, which led to criminal charges being filed against Davis that were about to come to trial.   A Dallas County jury convicted Davis of capital murder and answered the Texas capital sentencing special issues favorably to the prosecution.   The Texas Court of Criminal Appeals ("TCCA") affirmed Davis's conviction and death sentence on direct appeal. *Davis v. State*, AP-77,031, 2016 WL 6520209 (Tex. Crim. App. Nov. 2, 2016).   The TCCA also denied Davis state habeas corpus relief.   *Ex parte Davis*, WR-84,065-01, 2021 WL 4186452 (Tex. Crim. App. Sept. 15, 2021).

Davis filed his original petition for federal habeas relief on September 14, 2022 (ECF no. 33), asserting six claims for relief, including a claim that his trial counsel rendered ineffective assistance by failing to adequately investigate Davis's background and present all available mitigating evidence (*i.e.*, his claim premised on the Supreme Court's holding in *Wiggins v. Smith*, 539 U.S. 510 (2003)).   On July 5, 2024, Davis filed an opposed motion for leave to amend and a proposed amended petition (ECF nos. 108 & 109), in which Davis presented expanded factual allegations supporting the claims contained in his original petition (particularly his ineffective assistance claim premised on *Wiggins*).   In his proposed amended petition Davis also argued for the first time in any legal proceeding that his trial counsel also rendered ineffective assistance by arguing at the guilt-innocence phase of trial that Davis was not guilty of capital murder but, rather, only non-capital murder because Davis's motive for committing his offense was unrelated to the fact his victim was a potential prosecution witness at his then-rapidly-approaching trial for the sexual assault of his murder victim (ECF no. 108-1).

In an Order issued March 20, 2025, the Magistrate Judge denied Davis's motion requesting leave to amend (ECF no. 117). Davis filed objections to the Magistrate Judge's Order denying leave to amend on May 5, 2025 (ECF no. 120). In a Memorandum Opinion and Order issued August 18, 2025, this court overruled Davis's objections to the Magistrate Judge's Order and denied Davis leave to amend (ECF 131). *Davis v. Guerrero*, 2025 WL 2390848 (N.D. Tex. Aug. 18, 2025). This court also denied Davis a CoA with regard to the denial of his motion for leave to amend. *Id.*

## II. BACKGROUND

As this court has previously explained, Davis testified extensively at the guilt-innocence phase of his trial and admitted that, in the weeks leading up to his capital offense, he stalked his teenage victim physically and electronically, hacked her telephone, and then shot her twice, stepped on her throat, and rolled her into a body of water, all because her outcries of sexual assault against him had resulted in the filing of criminal charges which were about to proceed to trial. A lengthy and accurate summary of Davis's tacit confession to capital murder during his guilt-innocence phase trial testimony, along with a detailed discussion of the prosecution's other evidence, appears in the TCCA's opinion affirming Davis's conviction and resulting death sentence on direct appeal. *Davis v. State*, AP-77,031, 2016 WL 6520209, *1-11 (Tex. Crim. App. Nov. 2, 2016).

As explained by the Magistrate Judge in his FCR, throughout Davis's trial testimony, as Davis had asserted in multiple post-arrest interviews, Davis repeatedly insisted he had murdered his victim because her allegations that Davis had sexually assaulted her had ruined his life. Davis insisted at trial that, when he murdered his victim, he was focused not on her status as a potential prosecution witness but, rather, on his own history as a victim of childhood sexual abuse. At no point in his original petition or proposed amended petition does Davis allege that his decision to testify at the

guilt-innocence phase of his trial in the manner in which he did was the product of anything other than his own voluntary decision.

### III. THE ISSUE OF TIMING

In Section I, pp. 1-10, of his objections to the Magistrate Judge's FCR, Davis argues that he was denied the opportunity to file a Reply brief to Respondent's Answer.   This assertion is factually inaccurate.

In the Magistrate Judge's original scheduling order, issued November 5, 2021 (ECF no. 7), the Magistrate Judge directed Davis to file his Reply brief within thirty days of the filing of Respondent's Answer or other responsive pleading.

Davis filed his original petition on September 14, 2022 (ECF no. 33).

Thereafter, in an Order issued December 9, 2022 (ECF no. 43), the Magistrate Judge granted Respondent an extension of time within which to file his Answer or other responsive pleading but took pains to continue in effect the remaining portions of his original scheduling order.

Respondent filed his Response to Davis's original petition on March 13, 2023 (ECF no. 64).

In an Order issued April 5, 2023 (ECF no. 72), the Magistrate Judge granted Davis an extension of time within which to file his Reply brief, *i.e.*, until sixty days after Respondent secured and filed the last batch of *juror questionnaire answers*.

Respondent filed the final batch of juror questionnaire answers on January 5, 2024 (ECF no. 87).   While Respondent filed a USB thumb drive on January 19, 2024 (ECF no. 90), there is no fact specific allegation before this court suggesting that the thumb drive in question contained any *juror questionnaire answers* that were not already submitted to the court as part of ECF no. 87 on January 5, 2024.   Likewise, Davis never requested an extension on the sixty-day deadline established

by the Magistrate Judge's Order issued April 5, 2023 (ECF no. 72).

Thus, under the plain language of the Magistrate Judge's scheduling order (ECF no. 7), as amended in the Order issued April 5, 2023 (ECF no. 72), the deadline for the filing of Davis's Reply brief was not later than *March 5, 2024* ~ the sixtieth day after the filing of the last batch of juror questionnaire answers.   That deadline expired without Davis filing a Reply brief.

Seven days after the expiration of the deadline for the filing of Davis's Reply brief   (March 12, 2024), Davis filed an unopposed motion requesting additional time within which to file a motion requesting leave to file an amended petition (ECF no. 91).   Nothing in that motion (or any other motion subsequently filed by Davis) requested an ex post facto extension on the *expired* deadline for the filing of Davis's Reply brief.

Furthermore, even if Davis misconstrued the applicable sixty-day time frame for the filing of his Reply brief as commencing on January 19, 2024 (*i.e.*, the date Respondent submitted the USB thumb drive), Davis never requested an extension on the 60-day deadline for his Reply brief. Davis's motion filed March 12, 2024 (ECF no. 91) requested only an extension on the deadline for Davis's filing of a motion for leave to amend.   Davis did not include a request in that motion for an extension on the deadline for the filing of his Reply brief.   Nor did the Magistrate Judge's Order issued March 12, 2024 (ECF no. 92) extend the deadline for the filing of Davis's Reply brief.   Thus, even if Davis and his counsel misconstrued the start date for the sixty-day window for the filing of his Reply brief, Davis did not file a Reply brief on or before March 19, 2024 and that deadline likewise expired without Davis having filed a Reply brief.   Moreover, by March 19, 2024, Respondent's Answer to the original petition had been on file for over a year.   As stated above, Respondent's Response (ECF no. 64) was filed March 13, 2023.

This Court has separately addressed and denied Davis's motion for leave to file an amended petition (ECF no. 131).

Davis argues in his objections that the Magistrate Judge suspended the deadline for the filing of Davis's Reply brief in an Order issued May 22, 2023 (ECF no. 75). Davis ignores the plain language of that Order, however. The Magistrate Judge's May 22, 2023 Order expressly stated that the suspension in question would extend *only* until Respondent complied with the Magistrate Judge's directive to file all relevant state court records (ECF no. 75, p. 4). As explained above, Respondent complied with the Magistrate Judge's directive in question not later than January 19, 2024 (ECF no. 90). Thus, as per the Magistrate Judge's Orders issued April 15, 2023 (ECF no. 72) and May 22, 2023 (ECF no. 75), Davis had sixty days from January 19, 2024 (the date Respondent filed the last of the relevant state court records) within which to file his Reply brief. Davis failed to do so.

At no point did the Magistrate Judge or this court extend beyond March 19, 2024 the deadline for the filing of Davis's Reply brief. Thus, Davis had more than a year from the date Respondent filed his Response or Answer to the original Petition within which to file a Reply brief addressing that pleading (*i.e.*. from March 13, 2023 until March 19, 2024). Contrary to Davis's argument in his objections to the FCR, nothing in Respondent's response to Davis's motion for leave to amend, filed on July 25, 2024 (ECF no. 110), alters that fact.

Thus, Davis's assertions in his objections to the FCR that (1) he was denied the opportunity to file a Reply brief in this cause and (2) the Magistrate Judge somehow suspended *indefinitely* the deadline for the filing of Davis's Reply brief are both factually inaccurate. All of Davis's objections contained on pages 1-10, Section I, of Davis's objections to the FCR (ECF no. 133) are overruled.

## IV. OVERVIEW OF THE MAGISTRATE JUDGE'S FCR

In his FCR, the Magistrate Judge concluded (1) the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") govern this court's review of those claims Davis presents in this federal habeas corpus proceeding which were adjudicated on the merits (and denied) during either Davis's direct appeal or state habeas proceeding; and (2) those claims which Davis presents to this court in this federal habeas cause which the TCCA failed to address on the merits should be analyzed under a *de novo* standard of review. (FCR, Section II).

With regard to Davis's challenges to the constitutionality of the Texas capital sentencing statute's future dangerousness special issue (claim 5), the Magistrate Judge concluded that, regardless of whether reviewed under AEDPA or a *de novo* standard, Davis's complaints about his punishment phase jury charge did not warrant federal habeas relief because there was no constitutional defect in the state trial court's jury instructions regarding the future dangerousness special issue. The Magistrate Judge explained that the future dangerousness special issue serves a very different role in capital sentencing from the "aggravating factors" which capital sentencing juries are required to evaluate and weigh against mitigating factors in weighing jurisdictions. As the Magistrate Judge also explained at length, this is because the eligibility determination required by the Supreme Court's discussion of Eighth Amendment requirements in *Tuilaepa v. California*, 512 U.S. 967, 971-73 (1994), takes place in Texas at the guilt-innocence phase of trial (by virtue of the Texas Legislature's narrow statutory definition of capital murder in Section 19.03 of the Texas Penal Code). Thus, Davis's vagueness challenge to the future dangerousness special issue lacks any arguable merit.

With regard to Davis's challenge to the state trial court's exclusion of audio recordings of cell phone conversations between Davis (posing as a young man named "D") and his teenage victim

(claim 4), the Magistrate Judge concluded that, regardless of whether reviewed under AEDPA or a *de novo* standard, Davis's complaints about the exclusion of the audio recordings in question did not warrant federal habeas relief because the exclusion did not render Davis's trial fundamentally unfair and because the TCCA's ruling on direct appeal applying state evidentiary rules and finding the excluded conversations to be hearsay was binding in this federal habeas proceeding. The Magistrate Judge also distinguished the Supreme Court's holdings in *Chambers v. Mississippi*, 410 U.S. 284 (1973), and *Green v. Georgia*, 442 U.S. 95 (1979).

With regard to Davis's challenge to the state trial court's denial of his final motion for continuance (claim 3), the Magistrate Judge concluded that, regardless of whether reviewed under AEDPA or a *de novo* standard, Davis's complaints about the trial court's denial of his final motion for continuance did not warrant federal habeas relief because the denial of Davis's final motion for continuance (made on the eve of trial) did not render Davis's trial fundamentally unfair. This was because the Magistrate Judge found Davis not only deliberately delayed informing his defense team of his new allegation that he had been sexually abused as a child by family members but Davis actively misled his defense team on that subject. The Magistrate Judge concluded the denial of Davis's final motion for continuance did not render his trial fundamentally unfair or otherwise violate due process principles, in part, because despite the denial, Davis's trial counsel were fully able to present evidence at trial through Davis's own testimony and other evidence showing Davis had been sexually abused as a child.

With regard to Davis's *Batson* claims (claim 2), the Magistrate Judge concluded that, regardless of whether reviewed under AEDPA or a *de novo* standard, Davis's *Batson* claims did not warrant federal habeas relief because the TCCA reasonably rejected these claims on the merits on

direct appeal.   The Magistrate Judge also concluded the state trial court properly accepted as credible the prosecution's race-neutral reasons for striking the three venire members in question and those reasons were supported by the record before the state trial court.

With regard to Davis's unexhausted ineffective assistance claim premised upon his trial counsels' failure to properly file and support a third motion for continuance (claim 3), the Magistrate Judge concluded Davis was not entitled to federal habeas relief under a *de novo* standard of review because, despite the technical defects in Davis's third motion for continuance, (1) the TCCA addressed the trial court's denial of that motion on the merits on direct appeal; (2) Davis's trial counsel were nonetheless able to present substantial evidence (including extensive records and Davis's own trial testimony) establishing Davis's history of childhood sexual abuse; and (3) any difficulty Davis's trial counsel experienced in presenting mitigating evidence on this subject was the result of Davis's own contrarian behavior and not the fault of his trial counsel.   Thus, the Magistrate Judge concluded Davis could not satisfy the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984).

With regard to Davis's ineffective assistance claim premised upon his trial counsels' failure to object to the prosecution's peremptory strikes of two Hispanic females (claim 2), the Magistrate Judge concluded that, regardless of whether reviewed under AEDPA or a *de novo* standard, Davis was not entitled to federal habeas relief.   This was because Davis's trial counsel testified without contradiction during Davis's state habeas proceeding that they chose not to raise   *Batson* objections to the two prosecution peremptory strikes in question because they had made the determination (based on the two venire members' voir dire testimony) that the defense would exercise its own peremptory strikes against each of those two female venire members.   Simply put, Davis's defense

team believed both of the venire members in question would likely make strong pro-prosecution jurors.     The Magistrate Judge found Davis had alleged no specific facts suggesting that determination by his trial counsel was objectively unreasonable.     Thus, the Magistrate Judge concluded Davis's trial counsel acted in an objectively reasonable manner in choosing not to make timely *Batson* objections when the prosecution chose to peremptorily strike the two Hispanic women in question.     Likewise, the Magistrate Judge concluded Davis once again failed to satisfy the prejudice prong of *Strickland*.

With regard to Davis's ineffective assistance claim premised upon his trial counsels' alleged failure to adequately investigate Davis's background and present all available mitigating evidence (claim 1), the Magistrate Judge concluded that, regardless of whether reviewed under AEDPA or a *de novo* standard, Davis's ineffective assistance claim did not satisfy either prong of *Strickland*.   More specifically, the Magistrate Judge concluded (1) it was objectively reasonable for Davis's trial counsel to choose not to call mental health experts to testify trial who had examined Davis because (a) doing so could have opened the door to Davis's examination and diagnosis by a prosecution expert and (b) a prosecution mental health expert was likely to conclude Davis exhibited antisocial personality disorder ("ASPD") or a similarly negative personality disorder; (2) Davis's trial counsel did present a substantial case in mitigation which disclosed to the jury Davis's history of childhood abuse and neglect, as well as expert testimony explaining the effect of such abuse and neglect on childhood development; and (3) Davis's trial counsel reasonably chose not to call some of Davis's family members to testify because they had personal knowledge of either (a) extraneous acts of criminal behavior by Davis which Davis's defense team had worked diligently to conceal from the prosecution or (b) the contents of an autobiographical novel Davis wrote while in custody awaiting trial which

glorified Davis's extraneous criminal behavior and emphasized the more heinous aspects of his capital offense.

With regard to Davis's unexhausted cumulative error claim (claim 6), the Magistrate Judge concluded this claim lacks arguable merit under a *de novo* standard of review because, for the reasons summarized above, there was no constitutional error to cumulate.

The Magistrate Judge also concluded the new, unexhausted, ineffective assistance claims contained in Davis's proposed amended federal habeas petition did not satisfy the prejudice prong of *Strickland* under *de novo* review because the evidence in the record *currently* before this court overwhelmingly establishes: (1) Davis's guilt; (2) that Davis's criminal background is vastly more extensive than was shown at trial; (3) that there is considerably more evidence showing Davis's propensity for future violence, especially toward women, than was presented at trial; (4) the truly manipulative and heinous nature of, and the highly sophisticated planning which preceded, Davis's capital offense; (5) that Davis took steps to conceal from both law enforcement and his own defense team the true source of the text messages which Davis claimed (immediately following his arrest) had been transmitted to his cell phone by his victim (but which were actually created and transmitted by Davis himself); and (6) the high probability that the additional expert mental health testimony which Davis now argued his trial counsel should have presented at trial (*i.e.*, the testimony of an examining defense mental health expert) would, if actually presented at trial, have resulted in a prosecution expert diagnosing Davis with ASPD or another equally detrimental personality disorder.

## V. RESPONDENT'S OBJECTIONS

Respondent objected to the Magistrate Judge's FCR (ECF no. 126).   Respondent objected not to the Magistrate Judge's substantive legal analysis of the claims raised in Davis's original petition

but, rather, to the Magistrate Judge's failure to address Respondent's alternative arguments that the third, fourth, fifth, and sixth claims contained in Davis's original petition were unexhausted, procedurally defaulted, or both.

Writing for this court in *Broadnax v. Davis*, 2019 WL 3302840, *29 n.41 (N.D. Tex. July 23, 2019), Judge Godbey explained that several members of the Supreme Court have recognized the legitimacy of a district court denying federal habeas relief on the merits, rather than relying on legal technicalities. *Id.*, (citing *Smith v. Texas*, 550 U.S. 297, 324 (2007) (Justice Alito, joined by Chief Justice Roberts, and Justices Scalia and Thomas, dissenting)). In *Lambrix v. Singletary*, 520 U.S. 518, 520 (1997), a Supreme Court majority recognized the efficacy of disposing of a case on the merits, rather than resolving issues of procedural default which can, and often do, entangle a federal habeas court in deciding myriad issues of state law. *Id.*, ("Judicial economy might counsel giving the *Teague* question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.").

The Fifth Circuit has repeatedly admonished federal district courts that they do not operate as super state supreme courts in habeas cases. *See, e.g.*, *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007); *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994).

Engaging in procedural default analysis in a federal habeas context necessarily involves a district court in deciding myriad state law issues. For instance, under well-settled Supreme Court precedent, a procedural default only bars federal habeas review of a claim when the state procedural rule which forms the basis for the procedural default was "firmly established and regularly followed" by the time it was applied to preclude state judicial review of the merits of a federal constitutional claim. *Edwards v. Carpenter*, 529 U.S. 446, 450 (2000); *Ford v. Georgia*, 498 U.S. 411, 424 (1991).

Such an inquiry necessarily requires a deep dive into the history of state appellate court application of state procedural default rules.

The Supreme Court has recognized exceptions to the procedural default doctrine where a federal habeas petitioner can show either (1) "cause and actual prejudice" for his default or (2) that failure to address the merits of his procedurally defaulted claim will work a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989). The cause and prejudice exception refers to situations in which some external factor impeded defense counsel's ability to comply with the state's procedural rules or petitioner's trial or state appellate counsel rendered ineffective assistance, resulting in the procedural default. *Coleman*, 501 U.S. at 753; *Murray v. Carrier*, 477 U.S. 477, 488 (1986). The fundamental miscarriage of justice exception means the federal habeas petitioner is able to supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335-36 (1992).

The Magistrate Judge's decision to eschew detailed analysis of the historical application of Texas procedural rules by Texas appellate courts to focus, instead, on the lack of any arguable merit in all of Davis's federal constitutional claims prejudiced neither party. It also avoided the necessity of deep dives into state law issues.

Furthermore, addressing the merits of Davis's federal habeas claims reduces (but does not eliminate) the likelihood that this court will be inundated with an interminable series of Rule 60(b) motions filed years after a final judgment has been rendered attacking the district court's procedural default ruling on a federal habeas claim. *See Ruiz v. Lumpkin*, 653 F.Supp.3d 331, 336-40 (N.D. Tex. 2023) (explaining that a district court's denial of a federal habeas claim *on the merits* may not be attacked via a Rule 60(b) motion; but a procedural default ruling on a federal habeas claim may, in

some cases, properly be the subject of a Rule 60(b) motion (citing *Gonzalez v. Crosby*, 545 U.S. 524, 530-31, 535 (2005)))**.**

Respondent's objections, which at best urge this court to make supplemental, alternative rulings on procedural default issues, are without merit and will be overruled in their entirety.

## VI. CONSTITUTIONALITY OF AEDPA IN LIGHT OF *LOPER BRIGHT*

In Section II, pp. 10-23, of his objections to the Magistrate Judge's FCR (ECF no. 133), Davis argues for the first time that AEDPA should not apply to this court's review of his claims for federal habeas relief because the Supreme Court's decision in *Loper Bright Enterprises v. Raimundo*, 602 U.S. 369 (2024), somehow renders unconstitutional AEDPA's limitations on federal habeas review. This argument is unpersuasive.

### A. A Brief History of Federal Habeas Review

The only reason this court has any authority to entertain Davis's federal habeas corpus petition is that Congress has enacted statutes, currently codified at Title 28 United States Code Subsections 2241(a) and 2254(a), which authorize federal district courts to grant the writ of habeas corpus to prisoners held in custody by the States. The circumstances under which this court, or any federal district court, may grant federal habeas corpus relief are likewise established by statute, specifically Title 28, United States Code Sections 2241-55. This is because the Constitution, in Article I Section 8, vests the authority to create federal district courts, in fact all federal courts other than the United States Supreme Court, in the United States Congress ("The Congress shall have Power: … To constitute Tribunals inferior to the supreme Court;").

Federal district courts are courts of limited jurisdiction. *Smith v. Spizzirri*, 601 U.S. 472, 476 n.2 (2024) (citing *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 552 (2005) (observing

that "[t]he district courts of the United States ... are 'courts of limited jurisdiction'" and "'possess only that power authorized by Constitution and statute'")); *Badgerow v. Walters*, 596 U.S. 1, 7 (2022) ("The district courts of the United States are courts of limited jurisdiction, defined (within constitutional bounds) by federal statute." (Citing *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994)).   As an inferior federal court, this court's authority to entertain actions filed by state prisoners seeking federal habeas relief is dependent upon congressional authorization. Federal district courts have not always been authorized to grant habeas corpus relief to state prisoners.   In fact, as explained below, Congress did not grant federal district courts the authority to issue writs of habeas corpus to state prisoners under any circumstances until 1867.

The jurisprudence of the Supreme Court confirms the limited historical scope of federal habeas review which the inferior federal courts may exercise.   As the Supreme Court explained in *Shinn v. Ramirez*, 596 U.S. 366, 375-76 (2022):

> A state prisoner may request that a federal court order his release by petitioning for a writ of habeas corpus. See 28 U.S.C. § 2254. The writ may issue "only on the ground that [the prisoner] is in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a). To respect our system of dual sovereignty, see *Printz v. United States*, 521 U.S. 898, 918, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), the availability of habeas relief is narrowly circumscribed, see *Brown v. Davenport*, 596 U.S. ----, ---- – ----, 142 S.Ct. 1510, 1523-1524, --- L.Ed.2d –--- (2022). Among other restrictions, only rarely may a federal habeas court hear a claim or consider evidence that a prisoner did not previously present to the state courts in compliance with state procedural rules.

The Supreme Court's earlier decision the same term in *Brown v. Davenport*, 596 U.S. 118 (2022), cited with approval in *Shinn*, is informative with regard to the scope of a federal district court's authority to issue a writ of habeas corpus.   In *Brown*, the Supreme Court held that a federal district court may not issue a writ of habeas corpus to a state prisoner unless the prisoner satisfies

both the harmless error test adopted by the Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619

(1993), and the test set forth by Congress in the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"). *Brown*, 596 U.S. at 122. The Supreme Court emphasized the authority to grant

federal habeas relief is proscribed by federal statute:

> When Congress supplies a constitutionally valid rule of decision, federal
> courts must follow it. In AEDPA, Congress announced such a rule. It instructed that
> a federal court "*shall not ... gran*[t]" relief with respect to a claim that has been
> adjudicated on the merits in state court "*unless*" the state court's decision was (1)
> "contrary to" or an "unreasonable application of " clearly established federal law, as
> determined by the decisions of this Court, or (2) based on an "unreasonable
> determination of the facts" presented in the state-court proceeding. § 2254(d)
> (emphasis added).

*Brown*, 596 U.S. at 127.

Justice Gorsuch's opinion for the Court in *Brown* discussed the history of the writ of habeas

corpus in the federal courts of this nation:

> Some background helps explain this arrangement. From the founding,
> Congress authorized federal courts to issue habeas writs to federal custodians. § 14,
> 1 Stat. 81–82. After the Civil War, Congress extended this authority, allowing federal
> courts to issue habeas writs to state custodians as well. See Act of Feb. 5, 1867, ch.
> 28, § 1, 14 Stat. 385. But these statutes used permissive rather than mandatory
> language; federal courts had the "power to" grant writs of habeas corpus in certain
> circumstances. That same structure lives on in contemporary statutes, which provide
> that federal courts "may" grant habeas relief "as law and justice require." 28 U.S.C.
> §§ 2241, 2243; *Wright v. West*, 505 U.S. 277, 285, 112 S.Ct. 2482, 120 L.Ed.2d 225
> (1992) (plurality opinion).

*Id.*, at 127-28. Following a brief discussion of the history of the writ of habeas corpus in both

England and this nation, Justice Gorsuch discussed the Court's holding in *Brown v. Allen*, 344 U.S.

443, 458 (1953). Significantly, he noted that the 1953 decision in *Brown* marked a significant shift

in the nature of habeas corpus jurisprudence in this nation: "The traditional distinction between

jurisdictional defects and mere errors in adjudication no longer restrained federal habeas courts.

Full-blown constitutional error correction became the order of the day." *Brown*, 596 U.S. at 130. This shift effectively granted to federal habeas courts the authority to review the validity of criminal judgments and to grant relief not just for jurisdictional error but for any violation of a defendant's federal constitutional rights which might have taken place at or before trial. *Id.*

Justice Gorsuch's opinion for the Court majority in *Brown v. Davenport* noted the sweeping change in federal habeas practice resulting from the Court's 1953 *Brown* decision led to the federal courts being inundated with petitions for federal habeas relief filed by state prisoners. *Brown*, 596 U.S. at 130-31. Justice Gorsuch explained that the Court began adopting procedural devices in an attempt to ameliorate the flood of federal habeas petitions with which the federal courts were battling, specifically citing the Court's adoption of rules of procedural default and the harmless error announced in *Brecht*. *Id.*, at 132-33. In his opinion for the Court, Justice Gorsuch explained these procedural rules were aimed at restoring the writ of habeas corpus to its status prior to 1953, by re-emphasizing both (1) the powerful and legitimate interest States possess in "punishing the guilty," *Id.*, at 132 (quoting *Calderon v. Thompson*, 523 U.S. 538, 556 (1998)), and (2) the reality that the granting of federal habeas relief to a state prisoner "intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Brown*, 596 U.S. at 132 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (internal quotation marks omitted)). It was with those considerations in mind, Justice Gorsuch declared, the Court had adopted its harmless error rule in *Brecht* in 1993. *Id.*, at 133.

Within that context, Justice Gorsuch recognized that Congressional enactment of AEDPA in 1996 "represented a sea change in federal habeas law." *Id.*, at 134. Within that context, Justice Gorsuch declared (1) the equitable principles the Supreme Court adopted prior to passage of

AEDPA continued to apply and (2) state prisoners seeking federal habeas relief remained obligated to satisfy not just AEDPA's test but also the harmless error rule in *Brecht* before a federal court could issue a writ of habeas corpus. *Id.*, at 134.

The Supreme Court's prior decisions construing the application of AEDPA likewise offered no clue that it viewed AEDPA as in any manner unconstitutional. For instance, in *Felker v. Turpin*, 518 U.S. 651, 662-65 (1996), the Supreme Court held the AEDPA provision (28 U.S.C. Section 2244(d)) mandating advance Circuit Court approval for the filing of a second or successive federal habeas petition in a federal district court (1) did not violate Article I, Section 9 of the Constitution (which bars suspension of the writ of habeas corpus) and (2) did not impinge upon the Supreme Court's original habeas corpus jurisdiction. In the course of its opinion in *Felker*, the Court recognized that, originally, federal habeas jurisdiction applied only to individuals held in federal, as opposed to state, custody: "the first Congress made the writ of habeas corpus available only to prisoners confined under the authority of the United States, not under state authority." *Id.*, 518 U.S. at 663 (citing *Ex parte Dorr*, 3 How. 103, 11 L.Ed. 514 (1845)). The Court's *Felker* opinion expressed the same historical view of the evolution of federal habeas authority as Justice Gorsuch would recite a quarter century later in *Brown v. Davenport*:

> It was not until 1867 that Congress made the writ generally available in "all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States." And it was not until well into this century that this Court interpreted that provision to allow a final judgment of conviction in a state court to be collaterally attacked on habeas.

*Felker*, 518 U.S. at 663 (Citation omitted). Nothing in *Felker* suggested or implied that congressional limitation on access to federal habeas corpus remedies in the federal district courts violated constitutional principle.

Writing for the Court in *Williams v. Taylor*, 529 U.S. 362, 399-413 (2000), Justice O'Connor explained that AEDPA effectively altered the standard of federal habeas review of claims fully adjudicated in the state courts.   *Williams*, 529 U.S. at 412-13:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

There was no issue regarding the constitutionality of AEDPA presented in *Williams*.   That case dealt with a pure question of statutory interpretation.   Still, *Williams* recognized the Court's view that AEDPA had dramatically altered the nature of federal habeas review in the federal district courts. *Id.*

With the foregoing historical context clear, this court now turns to Davis's contention that the Supreme Court's recent holding in *Loper Bright*, as well as a concurring opinion by Justice Gorsuch in that case, somehow rent asunder everything Justice Gorsuch so meticulously explained in his opinion for the Court in *Brown v. Davenport*.

## B. Judicial Review of Administrative Agency Decisions

In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Supreme Court confronted neither a state prisoner seeking vindication of his constitutional rights

through federal habeas review nor the constitutionality of a federal statute.   Rather, the issue before the Court in *Chevron* was the propriety under the Clean Air Act of a regulation promulgated by the Environmental Protection Agency in furtherance of its duty to enforce that statute.   In the course of addressing this administrative law issue, the Court explained the question before it as follows:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.   If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 467 U.S. at 842-43 (Footnotes omitted).

The *Chevron* court acknowledged that the power of administrative agencies to administer congressionally created programs necessarily requires the formulation of policies and the making of rules to fill in the gaps, explicit or implicit, in the congressional enactment.   *Id.*, at 843.   The Court explained that when Congress explicitly left a gap for the agency to fill, the agency's regulations addressing that gap were "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."   *Id.*, at 843-44.   In cases in which a congressional delegation of authority to an agency was implicit, the Court held "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."   *Id.*, at 844.   "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations."   *Id.*   The Court explained that such deference should

be applied when "the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations."  *Id.*  The foregoing judicially crafted legal doctrine eventually became known colloquially as "the *Chevron* doctrine" or "*Chevron* deference."

In *Loper Bright Enterprises v. Raimundo*, 602 U.S. 369 (2024), the Supreme Court once again confronted neither a request by a state prisoner for federal habeas relief nor a constitutional challenge to a federal statute.  Instead, two groups of fishermen challenged a rule adopted by a federal agency (the National Marine Fisheries Service) as part of its duties to enforce a federal statute addressing maritime fishing in U.S. waters (the Magnuson-Stevens Fishery Conservation and Management Act), which required operators of fishing vessels in U.S. waters to pay for third-party observers on their vessels when a government observer was unavailable.  Chief Justice Roberts began his opinion for the Court majority in *Loper Bright* by announcing the Court was using the case to overrule the judicially created doctrine of deference to agency rule-making it had recognized in *Chevron*.  *Loper Bright*, 603 U.S. at 377-80.  The Court then explained the operative facts and procedural history of the cases before it.  *Id.*, at 380-84.  Chief Justice Roberts proceeded to describe the principles of judicial review and judicial independence which ascribed to the Constitution's Framers as they adopted Article III of the Constitution and what he viewed to be the proper role of the federal courts in performing their duty to determine the cases and controversies brought before them.  *Id.*, at 384-87.

The Supreme Court majority's opinion continued with a discussion of the development of the Court's administrative law jurisprudence from the New Deal forward, arguing that the

fundamental distinction between judicial review of factual determinations made by executive branch agencies and determinations of law. *Id.*, at 387-90. More specifically, the Court majority explained what it viewed as the long-standing tradition of judicial deference to agency fact-finding and expertise did not extend to agency determinations of purely legal matters. *Id.* Next, the Court explained that Congress enacted the federal Administrative Procedure Act ("APA") in 1946 "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Id.*, at 391 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)).

The Supreme Court then carefully analyzed the history and text of the APA and concluded that the congressional enactment requires federal courts construing statutes to exercise their independent judgment when addressing questions of law: "The APA, in short, incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions. In exercising such judgment, though, courts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes." *Loper Bright*, 603 U.S. at 394. The Court concluded that the deference required by *Chevron* was inconsistent with the foregoing principles within the APA. *Id.*, at 396 ("The deference that *Chevron* requires of courts reviewing agency action cannot be squared with the APA.").

The Supreme Court then launched into a lengthy discussion of the reasons why it believed *Chevron* deference could not be reconciled with the APA and such deference had become unworkable as a practical matter. *Id.*, 397-413. Chief Justice Roberts emphasized the nature of the beast the Court was slaying: "*Chevron* was a *judicial invention* that required judges to disregard their

statutory duties." *Id.*, at 411 (emphasis added).   The Court overruled *Chevron* and declared a new responsibility for federal courts consistent with the APA: "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."   *Id.*, at 412.   Because both of the Circuit Courts which had addressed the propriety of the agency rule in question had expressly relied upon *Chevron* to uphold the rule and grant summary judgment against the fishermen, the Court reversed and remanded for reconsideration of the issue absent the influence of *Chevron*.   *Id.*, at 413.

In a separate opinion, Justice Gorsuch, who joined the Supreme Court's majority, expressed his own views of the three "lessons" he drew from history which counseled in favor of the majority's decision to abandon the *Chevron* doctrine:

> Lesson 1, because *Chevron* deference contravenes the law Congress prescribed in the Administrative Procedure Act. Lesson 2, because *Chevron* deference runs against mainstream currents in our law regarding the separation of powers, due process, and centuries-old interpretive rules that fortify those constitutional commitments. And Lesson 3, because to hold otherwise would effectively require us to endow stray statements in *Chevron* with the authority of statutory language, all while ignoring more considered language in that same decision and the teachings of experience.

*Loper Bright*, 603 U.S. at 427 (Gorsuch concurring).

Justice Gorsuch then explained that he fully concurred with Chief Justice Roberts's views on the primacy of the role courts play in the interpretation of the law and the incompatibility of that principle with the *Chevron* doctrine:

> From the Nation's founding, they considered "[t]he interpretation of the laws" in cases and controversies "the proper and peculiar province of the courts." The Federalist No. 78, p. 467 (C. Rossiter ed. 1961) (A. Hamilton). Perhaps the Court's most famous early decision reflected exactly that view. There, Chief Justice Marshall declared it "emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 1 Cranch at 177. For judges "have neither FORCE nor

> WILL but merely judgment"—and an obligation to exercise that judgment independently. The Federalist No. 78, at 465. No matter how "disagreeable that duty may be," this Court has said, a judge "is not at liberty to surrender, or to waive it." *United States v. Dickson*, 15 Pet. 141, 162, 10 L.Ed. 689 (1841) (Story, J.). This duty of independent judgment is perhaps "the defining characteristi[c] of Article III judges." *Stern v. Marshall*, 564 U.S. 462, 483, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).

*Id.*, at 429-30.

As was true for Chief Justice Roberts's majority opinion, despite the length and breadth of his concurring opinion in *Loper Bright* (found at 603 U.S. at 416-48), at no point did Justice Gorsuch suggest he was attempting to determine the constitutionality of a federal statute.  Instead, what is clearly evident from both the majority and Justice Gorsuch's concurring opinions in *Loper Bright* is that the author's focus in each opinion was on whether the judicially created *Chevron* doctrine warranted continued adherence by federal courts given (1) the requirements of the APA and (2) the traditional role of federal courts as arbiters of the law when confronting the interpretation of federal statutes.  Their common conclusion that continued application of *Chevron* deference could not be reconciled with either the APA or historical tradition bears no rational relationship to the constitutionality of AEDPA.

Moreover, given the majority's express reliance in *Loper Bright* on the language of the APA as determinative on the issue before it, its discussion of the historical tradition of the primacy of judicial review on issues of law, as opposed to fact, is rendered little more than *obiter dictum*, that is, "something said in passing" or which refers to a point of law not directly relevant to the case and, thus, not forming a binding precedent.  *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 66-67 (1996) ("We adhere in this case, however, not to mere *obiter dicta*, but rather to the well-established rationale upon which the Court based the results of its earlier decisions. When an opinion issues

24

for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."); *Bennis v. Michigan*, 516 U.S. 442, 450 (1996) ("It is to the holdings of our cases, rather than their dicta, that we must attend." quoting *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 379 (1994)); *Williams v. United States*, 289 U.S. 553, 568 (1933) ("None of these cases involved the question now under consideration, and the expressions referred to were clearly obiter dicta, which, as said by Chief Justice Marshall in *Cohens v. Virginia*, 6 Wheat. 264, 399, 5 L.Ed. 257, 'may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision.'").

### C. The Constitutionality of AEDPA

#### 1. Davis's Arguments

Davis   relies primarily upon Chief Justice Roberts's and Justice Gorsuch's ruminations in *Loper Bright* on the historical tradition of the primacy of judicial review on issues of law as the basis for his constitutional challenge to the AEDPA's restriction (in Section 2254(d)) on federal habeas review of claims that were litigated and resolved on the merits in the state courts.

#### 2. AEDPA's Impact on Federal Habeas Review

As Justice O'Connor explained for the Supreme Court in *Williams*, in AEDPA Congress placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners.   *Williams*, 529 U.S. at 399.

The legislative history of AEDPA indicates that it was intended as a limitation upon the scope of federal habeas review, not as an enactment intended to broaden the scope of federal habeas review or to reconfigure federal habeas courts as super state appellate courts.   One of the principal purposes of the AEDPA was to reduce delays in the execution of state and federal criminal sentences,

especially capital sentences. *Ryan v. Valencia Gonzales*, 568 U.S. 57, 76 (2013); *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007); *Rhines v. Weber*, 544 U.S. 269, 276 (2005). Another purpose of the AEDPA was to encourage litigants to pursue claims in state court prior to seeking federal collateral review. *Duncan v. Walker*, 533 U.S. 167, 181 (2001); *see also Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (the AEDPA imposes the burden on a petitioner to litigate to the maximum extent possible, including fairly presenting all available evidence supporting, his claims in state court). The AEDPA was also intended to prevent piecemeal litigation and gamesmanship. *Maywood v. Patterson*, 561 U.S. 320, 334 (2010). Thus, under the AEDPA, federal habeas review of claims is limited to the record that was before the state court that adjudicated the prisoner's claims on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). "The AEDPA statute of limitations promotes judicial efficiency and conservation of judicial resources, safeguards the accuracy of state court judgments by requiring resolution of constitutional questions while the record is fresh, and lends finality to state court judgments within a reasonable time." *Day v. McDonough*, 547 U.S. 198, 205-06 (2006). Collectively, the provisions of the AEDPA further the principles of comity, finality, and federalism. *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007); *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Under the AEDPA standard of review, this Court cannot grant Davis federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding.  *Brown*, 569 U.S. at 135-36; *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams*, 529 U.S. at 404-05; 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. § 2254(d)(1) have independent meanings.  *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'").  A state court's failure to cite Supreme Court authority does not, per se, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case.  *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly

27

established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins*, 539 U.S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."); *Wiggins*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). "Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions existing at the time of the relevant state-court decision establish those principles. *Brown*, 596 U.S. at 136 ("It is not enough that the state court decision offends lower federal court precedents. This Court's dicta cannot supply a ground for relief." (Citation omitted)); *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301(2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, § 2254(e)(1) provides that a federal habeas petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice*, 546 U.S. 333, 338-39 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1). It remains unclear at this juncture whether § 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under §

2254(d)(2).  *See Wood*, 558 U.S. at 300-01 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

The deference to which state-court factual findings are entitled under AEDPA does not imply an abandonment or abdication of federal judicial review.  *See Miller-El*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief.").

### 3. Analysis

Insofar as Davis relies upon obiter dictum in the majority opinion in *Loper Bright* and Justice Gorsuch's concurring opinion in the same case, his arguments are unpersuasive.  Nothing in *Loper Bright* purported to address the constitutionality of a federal statute, such as AEDPA.  On the contrary, in that case the Supreme Court relied upon a federal statute, the APA, as the legal basis for rejecting a judicial creation – the *Chevron* doctrine.  Nor do Davis's citations to *Loper Bright* cast any doubt on the continuing efficacy of the many Supreme Court decisions since the enactment of AEDPA discussed above which recognized the limitations Congress placed on federal habeas review by the federal district courts.  Davis cites no decision by the Supreme Court or any other federal court in which a petition for federal habeas corpus relief was denied on the basis of *Chevron* deference.  Accordingly, his arguments premised on *Loper Bright* bear no rational relationship to the issue of AEDPA constitutionality.

Davis's reliance on Chief Justice Roberts's and Justice Gorsuch's discussions of the Supreme Court's decision in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), is likewise

misplaced.  *Marbury* addressed the propriety of a Congressional enactment which purported to add to the Supreme Court's original jurisdiction.  Chief Justice Marshall reasoned for the Court that Congress lacked the constitutional authority to add or detract from the authority expressly granted to the Supreme Court in Article III of the Constitution.   In *Felker*, the Supreme Court held AEDPA did *not* purport to impose any restriction on the Supreme Court's *original* habeas corpus jurisdiction, only on its *appellate* jurisdiction, a matter expressly reserved to Congress under Article III, Section 2.  *Felker*, 518 U.S. at 661.  Davis fails to recognize that the Supreme Court of the United States has consistently held federal district courts may exercise only the federal habeas authority granted to them by Congress pursuant to Article I, Section 8 of the Constitution.   Even the Supreme Court's 1953 decision in *Brown v. Allen* recognized as much: "Jurisdiction over applications for federal habeas corpus is controlled by statute."   *Brown*, 344 U.S. at 460 (citing Section 2241(a)).

Likewise, Davis's historical references to federal habeas cases decided prior to 1867 have no relevance to AEDPA constitutionality.  As discussed above, and as the Supreme Court has explained multiple times, because of a lack of statutory authorization, federal district courts exercised no habeas corpus authority prior to 1867 over state prisoners.

Finally, in *Cobb v. Thaler*, 682 F.3d 364, 273-77 (5th Cir. 2012), the Fifth Circuit expressly rejected arguments that Section 2254(d)(1) unconstitutionally impinges upon the decisional independence of the federal courts – the same basic arguments presented by Davis in his amorphous challenge in his objections to the FCR to AEDPA constitutionality.   More specifically, in *Cobb*, the Fifth Circuit expressly rejected arguments that (1) § 2254(d)(1) (which limits federal habeas relief to detentions pursuant to state court violations of "clearly established Federal law, as determined by the Supreme Court") unconstitutionally dictates how federal courts adjudicate habeas cases by

restricting them to considering only certain legal authorities and (2) § 2254(d)(1)'s "unreasonable application" standard instructs federal courts to defer to state court interpretations of federal law.

With regard to Cobb's former argument, the Fifth Circuit held Section 2254(d)(1) does not intrude on the independent adjudicative authority of the federal courts. *Cobb*, 682 F.3d at 374.   The Fifth Circuit reasoned that "[r]egulating relief is a far cry from limiting the interpretive power of the courts ... and Congress has ample power to adjust the circumstances under which the remedy of the writ of habeas corpus is deployed." *Cobb*, 682 F.3d at 374-75 (quoting *Lindh v. Murphy*, 96 F.3d 856, 872 (7th Cir. 1996), *overruled on other grounds*, 521 U.S. 320 (1997)).   The Fifth Circuit concluded Cobb's Article III arguments could not withstand scrutiny:

> Most fundamentally, Cobb's Article III challenge is untenable because it depends on an assumption that contradicts nearly two centuries of Supreme Court precedent. Cobb assumes that if Congress gives federal courts habeas jurisdiction to consider collateral attacks on state convictions it must give them plenary authority to consider afresh any and every error of federal law made by the state court. The Supreme Court, however, has long permitted Congress to extend habeas jurisdiction to federal courts without authorizing them to reconsider the legal determinations of criminal courts. Indeed, the common law understanding of the writ forbade reexamination of the judgments of criminal courts of competent jurisdiction.

*Cobb*, 682 F.3d at 375.

With regard to Cobb's latter argument, after examining the history of federal habeas practice in this nation, the Fifth Circuit held "Congress may constitutionally grant federal courts habeas jurisdiction over collateral challenges to state convictions and yet limit the availability of the remedy to exceptional circumstances."   *Id.*, at 376-77.   The Fifth Circuit noted that, in *Felker*, the Supreme Court had rejected a Suspension Clause challenge to a different provision of AEDPA by emphasized that "judgments about the proper scope of the writ are 'normally for Congress to make.'" *Id.*, at 377 (quoting *Felker*, 518 U.S. at 664) (in turn quoting *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996)).

The Fifth Circuit's holding in *Cobb* forecloses the constitutional arguments Davis makes in his objections to the FCR. This court lacks the authority to either disregard or overrule the Fifth Circuit's clear holding in *Cobb* which, unlike the language in *Loper Bright* on which Davis relies, is not obiter dictum.

Davis argues in a conclusory manner that the Supreme Court's majority opinion and Justice Gorsuch's concurring opinion in *Loper Bright* warrant "reconsideration" of the holding in *Cobb* as well as all of the many Supreme Court authorities discussed above. What Davis does not offer is a rational explanation for why such "reconsideration" is necessary at this juncture. Neither the history of federal habeas practice in this nation, as documented by the Supreme Court in the many opinions discussed above, nor the plain language of the Constitution support Davis's constitutional challenge to AEDPA. As explained above, *Loper Bright* had absolutely nothing to do with either federal habeas practice or the constitutionality of a federal statute such as AEDPA.

Moreover, in this Circuit, a district court is not free to declare that a rule announced by the Fifth Circuit has been abrogated by a subsequent Supreme Court decision. *See In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 790 (5th Cir. 2021) (holding a district court is not free to overturn a rule announced by the Fifth Circuit based upon a subsequent Supreme Court decision). Thus, insofar as Davis seeks a holding that the Supreme Court's opinion in *Loper Bright* effectively overruled the Fifth Circuit's clear holdings in *Cobb*, he must seek that ruling from the Fifth Circuit and not this court. For the reasons discussed at length above, however, Davis is not entitled to a Certificate of Appealability on this new legal argument.

Accordingly, insofar as Davis argues that AEDPA has no application to this court's review of his federal habeas claims, his arguments are without arguable merit. All of Davis's objections in Section II, pp. 10-23, of his objections to the FCR are overruled.

### VII. PETITIONER'S OBJECTIONS ON THE MERITS

This court will grant Davis's opposed motion for leave to file excessive pages of objections to the Magistrate Judge's FCR (ECF no. 132) in an effort to expedite the disposition of this wholly meritless federal habeas action. Insofar as Davis objects to the application of AEDPA to some of his claims, for the reasons set forth at length above in Section VI, those objections are without merit and are overruled.

### A. The *Wiggins* Claim

In Section III, pp. 23-62, of his objections to the FCR, Davis argues the Magistrate Judge erroneously recommended rejection of Davis's *Wiggins* claim by (1) incorrectly applying the dual prongs of ineffective assistance analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984); (2) erroneously concluding Davis's trial counsel made objectively reasonable strategic decisions regarding which mitigating evidence to present at trial; (3) erroneously concluding Davis's newly proffered mitigating evidence was either cumulative of evidence already presented at trial or double-edged in nature; (4) erroneously concluding Davis's trial counsel conducted an objectively reasonable investigation of Davis's background for mitigating evidence; (5) erroneously blaming Davis for the decisions made by his trial counsel after an allegedly inadequate investigation for mitigating evidence; (6) erroneously concluding Davis would have been diagnosed as exhibiting antisocial personality disorder ("ASPD") had Davis been examined by a prosecution mental health expert; (7) erroneously failing to give weight to the state habeas testimony of Davis's legal experts,

including attorney D. Recer; and (8) failing to recognize that Davis cooperated fully with his defense team.   The Magistrate Judge analyzed this ineffective assistance claim in Section VII.F. of the FCR.

Davis fails to acknowledge, however, that (1) his trial counsel were confronted with a client who had confessed to both law enforcement agents and the media (after his arrest) that he killed his victim because her accusations that he had sexually assaulted her multiple times had ruined his life; (2) Davis insisted on testifying at the guilt-innocence phase of his capital murder trial (where he confirmed the foregoing); (3) the new evidence available to the state habeas court showed that Davis had a much longer (and more violent) criminal history than was shown by the evidence presented to the jury at Davis's trial; (4) Davis's trial counsel were reasonably concerned that a prosecution mental health expert might diagnose Davis with ASPD or another equally devastating personality disorder; (5) Davis admitted that he stalked his teenage victim both electronically and physically to her new high school and managed to convince her to get into his vehicle before he drove her to the isolated location where he murdered her; (6) Davis lied to the media, law enforcement, and his own defense team following his arrest when he claimed to have text message on his cell phone from his victim exonerating Davis on the sexual assault charges (when in fact electronic forensic experts later determined Davis manufactured those text messages using sophisticated computer applications); and (7) when viewed objectively, the evidence available to the state habeas court when it rejected Davis's ineffective assistance claims showed Davis had (a) groomed his teenage victim (in part by furnishing her with a cell phone); (b) actively misled both law enforcement authorities and his own defense team by, among other things, concealing for many months the fact that he created the text messages which he claimed exonerated him on the sexual assault charges; and (c) actively misleading his defense team until the eve of trial by denying he had ever been sexually abused by family members.

Davis's assertion in his objections to the FCR that he "fully cooperated" with his defense team is belied by the evidence presented during Davis's state habeas evidentiary hearing.

In light of the foregoing, the Magistrate Judge ultimately concluded that the evidence of Davis's guilt and the evidence of Davis's demonstrated propensity for future violence were both so overwhelming as to dwarf the mitigating aspects of Davis's new mitigating evidence (and render non-prejudicial any alleged deficiencies in the performance of Davis's trial counsel). The record before the state habeas court and the evidence now before this court on this subject fully support the Magistrate Judge's conclusion. Contrary to Davis's assertions in his objections to the FCR, the new mitigating evidence Davis presented to the state habeas court and which Davis presents to this court is almost entirely either cumulative of the mitigating evidence actually presented at trial or double-edged in nature.

Furthermore, contrary to the arguments contained in Davis's objections to the FCR, the record from Davis's state habeas evidentiary hearing contains extensive testimony from Davis's team of four trial counsel (accurately summarized by the Magistrate Judge in Section I.F.2.a. of the FCR) which establishes that Davis's defense team had objectively reasonable reasons for choosing not to present certain testimony at the punishment phase of trial. More specifically, that testimony shows Davis's defense team chose not to present testimony at trial from either (1) an examining mental health expert (over concern that presenting such testimony could open the door to a potentially devastating diagnosis by a prosecution mental health expert who had examined Davis); (2) Davis's older brother Johnnie (over concerns that Johnnie's testimony might (a) undermine the defense's evidence that an ice cream vendor sexually assaulted Davis during his childhood; (b) undermine the mitigating impact of the defense's evidence showing the horrific conditions under which Davis grew

up in St. Louis by showing that he (Johnnie) had grown up in the same environment yet later became a responsible, law-abiding, adult; and (c) open the door to the prosecution presenting the jury with the autobiographical novella Davis wrote while awaiting trial which glorified Davis's criminal background and showed a distinct lack of remorse for his capital offense); (3) one of Davis's sisters (who apparently suffered a panic attack during trial and refused to testify in open court about her own history of childhood sexual abuse); (4) Johnnie's wife (who refused to travel to Dallas from California to testify at trial despite defense counsel wiring her a plane ticket); (5) Davis's brother Sammy (over concerns that, because Sammy was then serving a lengthy prison sentence for a violent felony the jury might view Sammy's criminal history as reinforcing the prosecution's argument that Davis was the product of a dysfunctional environment which conditioned the children in Davis's family to engage in criminal misbehavior); (6) Davis's relatives from Arkansas (over concerns that most of them also had criminal records for violent felonies or possessed knowledge that Davis's criminal background was much more extensive and violent than shown in the prosecution's evidence at the punishment phase of trial); and (7) Davis's former paramours (over concerns these individuals had knowledge of additional acts of domestic violence by Davis).

The expert opinion testimony at Davis's state habeas hearing offered by defense attorney D. Recer amounted to little more than Monday morning quarterbacking of the worst variety. While Davis selects sanitized passages from his autobiographical novella in an attempt to show that document would not have been harmful to him had it been admitted into evidence, Davis's argument is unpersuasive. The tacit glorification of his own criminal history and lack of remorse for his capital offense contained in that document made eminently reasonable the decision by Davis's defense team to do everything in their power to keep it out of the hands of Davis's capital

sentencing jury.  Likewise, Davis's trial counsel had objectively reasonable reasons for wishing to avoid having a prosecution mental health expert evaluate Davis and then testify at trial.  Davis's objections contained in Section III, pp. 23-62, of his objections to the FCR are all overruled.

## B. The *Batson* Claims

In Section III, pp. 62-70, of his objections to the FCR, Davis argues the Magistrate Judge erroneously recommended denial of Davis's *Batson* claims and denial of his related ineffective assistance claim.  The Magistrate Judge analyzed Davis's *Batson* claims in Section VI of the FCR and Davis's related ineffective assistance claim in Section VII.E of the FCR.

Disturbingly, Davis's objections to the FCR fail to address the leading case in this Circuit addressing *Batson* claims in Dallas County, i.e., *Broadnax v. Lumpkin*, 987 F.3d 400, 410-12 (5th Cir. 2021) (holding a prosecutor's reliance on answers to a juror questionnaire asking for the venire members' personal views on the death penalty (the same exact question relied upon by Davis's prosecutors during jury selection) was an appropriate, race-neutral, basis for exercising a peremptory challenge).  The Fifth Circuit's clear holding in *Broadnax* forecloses Davis's *Batson* claims in this case.  For the reasons discussed by the Magistrate Judge in detail in Section VI of the FCR, Davis's *Batson* claims lack any arguable merit.  For the reasons discussed at length in Section VII.E. of the FCR, Davis's related ineffective assistance claim lacks any arguable merit.  All of Davis's objections contained in Section III, pp. 62-70, of his objections to the FCR are overruled.

## C. Denial of Third Motion for Continuance

In Section III, pp. 70-73 of his objections to the FCR, Davis argues the Magistrate Judge erred in recommending denial of his claim attacking the trial court's denial of Davis's third motion for continuance and the denial of Davis's related ineffective assistance claim.

For the reasons set forth at length in Section V of the FCR, the Magistrate Judge accurately concluded Davis's complaints about the denial of Davis's third motion for continuance were insufficient to rise above the level of harmless error announced in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Thus, Davis is not entitled to federal habeas relief on that claim. *Brown*, 596 U.S. at 122. Likewise, for the reasons discussed at length in Section VII.D. in the FCR, Davis's complaints about the manner in which his trial counsel drafted and argued his third motion for continuance are insufficient to satisfy the prejudice prong of *Strickland*.

Basically, despite the alleged defects in Davis's third motion for continuance, the TCCA later addressed the merits of Davis's point of error on direct appeal complaining about the denial of his third motion for continuance. Furthermore, Davis's speculative assertions about his ability to secure additional impeachment evidence had he been granted a third continuance ignore the reality facing the state trial court at the time Davis filed that motion: the state trial court had already granted Davis two motions for continuance; there was nothing new in the third motion for continuance (in fact, it was virtually identical to Davis's second such motion); and all of the information Davis's trial counsel claimed they hoped to obtain during the third continuance was within the personal knowledge of Davis himself (and had been the entire time Davis was in custody). Davis never explained to the state trial court why he had failed to furnish this information to his trial counsel prior to the advent of trial on the merits. The state trial court reasonably concluded the third motion for continuance was unjustified. Furthermore, even without a third continuance, Davis

was able to testify at trial regarding his own history as a child-victim of sexual abuse.   Under such

circumstances, the denial of Davis's third motion for continuance was harmless, at best, and did not

prejudice Davis within the meaning of *Strickland*.   All of Davis's objections in Section III, pp. 70-72

of his objections to the FCR are overruled.

### D. Exclusion of Audio Recordings of Davis's Phone Conversations with his Victim

In Section III, pp. 73-76, of his objections to the FCR, Davis argues the Magistrate Judge

erred in recommending the denial of Davis's claim based on the trial court's exclusion of audio

recordings of telephone conversations between Davis (who was posing as a teenage boy or young

man named "D") and Davis's capital murder victim.   The Magistrate Judge analyzed Davis's

complaint about the exclusion of the audio recordings in question in Section IV of the FCR.

Davis argues in his objections to the FCR that the recordings in question should have been

admitted as "impeachment evidence."   He does not identify, however, any witness or witnesses

whose trial testimony could have been "impeached" through admission of the recordings of his

conversations with his late teenage victim.   Davis's victim never testified at any trial.   Davis made

absolutely certain that did not happen.   While Davis did testify at the guilt-innocence phase of trial,

admission of the recordings in question for the purpose of impeaching Davis's own trial testimony

seems nonsensical.   All of Davis's objections in Section III, pp. 73-76 of his objections to the FCR

are overruled.

### E. Alleged Defects in the Future Dangerousness Special Issue

In Section III, pp. 76-80 of his objections to the FCR, Davis argues the Magistrate Judge

erroneously recommended denial of his claim premised upon alleged defects in the future

dangerousness special issue submitted to the capital sentencing jury at the punishment phase of

Davis's trial.  Davis argues the Magistrate Judge misapprehended his legal argument.  Davis contends that his argument is that the Texas capital sentencing statute's future dangerousness special issue and the jury instructions accompanying same failed to adequately limit the scope of evidence relating to future dangerousness which the jury could consider when answering that special issue. The Magistrate Judge addressed this claim in Section III of the FCR.

Davis once again fails to comprehend, despite the Magistrate Judge's careful explanation in the FCR, that the Texas capital sentencing statute accomplishes the constitutionally mandated "narrowing function" discussed in *Tuilaepa v. California*, 512 U.S. 967, 971-73 (1994), at the guilt-innocence phase of a capital murder trial.  *Allen v. Stephens*, 805 F.3d 617, 628 (5th Cir. 2015); *Turner v. Quarterman*, 481 F.3d 292, 299 (5th Cir. 2007) (Citing *Jurek v. Texas*, 428 U.S.  262, 268-72 (1976)).  Unlike the eligibility decision, for which the Supreme Court has mandated narrow statutory definitions of aggravating elements, the selection decision which takes place during the punishment phase of a Texas capital murder trial is governed by an entirely different set of constitutional constructs.

As noted by the Magistrate Judge, the Supreme Court has explained at great length that the constitutional requirements applicable to the selection decision differ from those applicable to the narrowing function in very significant ways.  *See Buchanan v. Angelone*, 522 U.S. 269, 275-77 (1998) (holding that there is no constitutionally mandated requirement that a trial court instruct a capital sentencing jury provide guidance on the concept of mitigation or instruct the jury on particular mitigating factors because, at the selection phase of a capital sentencing proceeding, the capital sentencer may not be precluded from considering any constitutionally relevant mitigating evidence). In *Buchanan*, the Supreme Court emphasized that states are not constitutionally obligated to

affirmatively structure the manner in which juries consider mitigating evidence. *Id.*, 522 U.S. at 276. In fact, the Supreme Court suggested that, at the selection phase of a capital sentencing proceeding, a state is free to allow the jury unfettered discretion. *Id.* (Citing *Tuilaepa*, 512 U.S. at 978-79).

Thus, Davis's arguments that his trial court was required to instruct his capital sentencing jury on the scope of mitigating evidence it could consider when answering the Texas capital sentencing statute's future dangerousness special issue are foreclosed by the Supreme Court's decisions in *Buchanan* and *Tuilaepa* and are legally frivolous. Because this portion of Davis's objections to the FCR ignores the plain holdings of the Supreme Court in both *Buchanan* and *Tuilaepa*, his arguments also come perilously close to violating Rule 11, Fed. R. Civ. P. *See Williams v. Lumpkin*, 339 F.R.D. 383, 387 (N.D. Tex. 2021) (recognizing that presenting legal arguments which fail to acknowledge the existence of well-settled relevant case law contrary to the litigant's position violates both the spirit and letter of Rule 11). All of Davis's objections in Section III, pp. 76-80 of his objections to the FCR are overruled.

### F. Cumulative Error

In Section III, pp. 80-81, of his objections to the FCR, Davis argues in conclusory fashion that the Magistrate Judge erroneously recommended denial of Davis's cumulative error claim. The Magistrate Judge addressed this claim in Section VIII of the FCR. This court agrees with the Magistrate Judge that there is no constitutional error in this cause to cumulate. For the reasons set forth at length in the FCR, none of Davis's ineffective assistance claims satisfy the prejudice prong of *Strickland*. For the reasons set forth at length in the FCR, all of Davis's remaining substantive

constitutional claims likewise lack arguable merit. All of Davis's objections in Section III, pp. 80-81, of his objections to the FCR are overruled.

## VIII. ORDER

For the foregoing reasons, it is hereby ORDERED that (1) Davis's motion for leave to file excessive pages of objections to the FCR, filed September 2, 2025 (ECF no. 132), is GRANTED; (2) all of Davis's objections to the Magistrate Judge's FCR (ECF no. 133) are OVERRULED; (3) all of Respondent's objections to the Magistrate Judge's FCR (ECF no. 126) are OVERRULED; (4) this court ADOPTS and incorporates by reference the Magistrate Judge's FCR (ECF no. 123) in its entirety; (5) all relief requested in Davis's original petition (ECF no. 33) is DENIED; (6) all relief requested in Davis's amended petition (ECF no. 108-1) is DENIED; (7) Davis's request for a federal evidentiary hearing is DENIED; and (8) Davis is DENIED a Certificate of Appealability on all claims contained in either his original petition, his amended petition, or his motion for leave to amend.

**DATED: September 5, 2025**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE